**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
SEAN FLYNN, :
                      Plaintiff, :
      -against- : 18-CV-2686 (VSB) (OTW)
:
: **REPORT & RECOMMENDATION**
:
ANDREW M. SAUL, Commissioner :
of Social Security,[1] :
                      Defendant. :
:
------------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

**TO THE HONORABLE VERNON S. BRODERICK, United States District Judge,**

I. **Introduction**

Plaintiff brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. §405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB"). Both parties have filed competing Motions for Judgment on the Pleadings, briefed in a joint stipulation. (ECF 20). For the reasons set forth below, I recommend that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED**, and that the Commissioner's Motion for Judgment on the Pleadings be **DENIED**, and that the case be remanded for further proceedings pursuant to 42 U.S.C. § 405(g).

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Andrew M. Saul for former Acting Commissioner Nancy A. Berryhill.

II. **Statement of Facts**

   A. **Procedural Background**

Plaintiff filed for disability benefits on November 12, 2014, alleging a disability onset date of May 20, 2001 for lumbar derangement and post-surgery right shoulder pain. (Tr. 172, 202). Plaintiff's application was initially denied on December 23, 2014, and Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 100-04, 112). ALJ Michael Stacchini held a hearing on December 13, 2016, at which both Plaintiff, represented by counsel, and vocational expert Renee Jubrey provided testimony. (Tr. 27). Following the hearing, ALJ Stacchini issued a decision on January 31, 2017, finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act as of the last date insured, March 31, 2007. (Tr. 10-21).

In a notice dated January 19, 2018, the Appeals Council informed Plaintiff that it denied his request for review of ALJ Stacchini's decision, rendering the Commissioner's decision final. (Tr. 1-3). Plaintiff then filed his complaint in this Court on March 26, 2018. (ECF 1).

   B. **Social Background**

Plaintiff is a 58-year-old male who worked as a police officer with the New York Police Department from 1982 through 2001. (Tr. 96, 203). Other than a short-term security job around 2011, Plaintiff has not worked since 2001. (Tr. 38). After his alleged onset date in 2001, Plaintiff was forced to cease his outdoor hobbies, *e.g.*, skiing and fishing, and spent much of his time at his ranch helping raise his four children. (Tr. 33-34, 39). Around 2005, Plaintiff's wife started working part-time. (Tr. 46). Plaintiff did not need to leave the house often because his children's schools were close to their house, and Plaintiff's father-in-law, who helped watch the

2

children, lived less than a mile away. (Tr. 47). Plaintiff would drive to go shopping at local supermarkets but avoided driving in crowded areas. (Tr. 48-49). Although Plaintiff's children primarily handled the chores, Plaintiff would help prepare breakfast and sandwiches for his children. (Tr. 35).

### C. Medical Records Until Date of Last Insured

#### 1. Dr. Andrew Turtel, M.D.

Plaintiff underwent arthroscopic surgery in December 1998 as a result of injuries sustained attempting to apprehend suspects. (Tr. 378-381). The orthopedic surgeon, Dr. Turtel, diagnosed the injury as a right shoulder impingement[2] with acromioclavicular[3] joint arthritis and a subscapularis[4] tear. (Tr. 378). At a follow-up visit on June 17, 1999, Dr. Turtel noted that Plaintiff was "markedly improved" but still experienced some limitations in his motions. (Tr. 388). An October 15, 1999 MRI report prepared by Faculty Practice Radiology notified Dr. Turtel that although there was no rotator cuff tear, there was a partial tear of the biceps, a "partial tear at the musculo-tendinous junction of the supraspinatus,"[5] and a "subacute tear of the anterior-inferior labrum." (Tr. 434-35). After discussing the MRI results with Dr. Turtel, Plaintiff requested an additional surgery to resolve the lingering pain caused by his subscapularis tear.

---

[2] Impingement refers to the displacement of something into a space that may collide with something else. *Dorland's Illustrated Medical Dictionary,* 923 (32d ed. 2012).
[3] Acromioclavicular refers to the acromion and clavicle, the bones over the shoulder joint forming the high point of the shoulder. *Dorland's Illustrated Medical Dictionary,* 20 (32d ed. 2012).
[4] Subscapularis refers to the area underneath the shoulder blade. *Dorland's Illustrated Medical Dictionary,* 1673 (32d ed. 2012).
[5] The supraspinatus is one of the rotator cuff muscles, located above the scapular spine. Jeno, Susan and Gary Schindler, *Anatomy, Shoulder and Upper Limb, Arm Supraspinatus Muscle*, available at https://www.ncbi.nlm.nih.gov/books/NBK537202/ (last updated Jan. 4, 2019).

(Tr. 387). On August 23, 2000, Plaintiff underwent a second surgery in which Dr. Turtel removed tissue fragments and particles in the biceps tendon. (Tr. 382).

On February 8, 2001, Dr. Turtel noted that despite the passage of time since the two surgeries, Plaintiff's right shoulder was "still significantly disabled." (Tr. 384). Plaintiff expressed difficulty and "significant pain" in active abduction above the horizontal plane, a symptom that Dr. Turtel opined would not diminish over time. *Id*. As a result, Dr. Turtel recommended that this amounted to a permanent disability in regards to Plaintiff's work as a police officer. *Id*.

### 2. Occupational Therapist Sally Poole

Plaintiff started working with Ms. Poole in November 2000 to rehabilitate his shoulder post-surgery. (Tr. 393). Ms. Poole provided a one-page letter in February 2001 in which she noted that Plaintiff's rotator cuff muscles were "seriously damaged," placing Plaintiff at risk of a full tear of the muscle if he were to engage in sudden movements with his shoulder. *Id*. Accordingly, Ms. Poole recommended that Plaintiff not return to the police force. *Id*.

### 3. Dr. James Carr, M.D.

Dr. Carr was Plaintiff's treating physician until about 2004. (Tr. 40-42). Dr. Carr passed away around 2004, which made it difficult for Plaintiff to subsequently recover any medical records from his treatment with Dr. Carr. (Tr. 42). As a result, Plaintiff has no records from Dr. Carr except for several prescriptions. (Tr. 401-02). Plaintiff said that he stopped going to Dr. Carr because he did not agree with Dr. Carr's approach of heavy reliance on pain medication. (Tr. 42).

Dr. Carr referred Plaintiff to radiologist Dr. Jacob Lichy in June 2003 for an x-ray of the lumbar spine. (Tr. 413). Dr. Lichy reported that the x-ray films revealed degenerative

osteoarthritic changes in both sacroiliac[6] joints, in addition to disc disease and spondylolysis.[7] *Id*.

### 4. Dr. Mario Nelson, M.D.

Plaintiff first saw Dr. Nelson, a specialist in physical medicine and rehabilitation, on May 2, 2003 upon referral from Plaintiff's treating physician, Dr. Carr. (Tr. 235). At the initial visit, Dr. Nelson found that Plaintiff had limited movement due to lower back pain and was in "obvious discomfort." *Id*. Plaintiff reported that his back pain was aggravated by prolonged sitting or standing. *Id*. Dr. Nelson concluded that Plaintiff had "significant" paravertebral muscle spasms at the lumbosacral[8] level. *Id*. After performing EMG/nerve conduction studies, Dr. Nelson ruled out a herniated disk or bilateral lumbosacral radiculopathy[9] but noted that Plaintiff might have lumbosacral spine stenosis.[10] (Tr. 236).

### 5. Police Pension Fund Examiners

After applying for accidental disability retirement from the New York City Police Department, Plaintiff was evaluated by Dr. Russell Miller, M.D., Dr. Kathleen Eaton, M.D., and Dr. Frank Guellich, M.D. (Tr. 395-398). In a report dated March 27, 2001, the doctors agreed that Plaintiff's orthopedic issues prevented him from returning to work as a police officer. (Tr. 397). The doctors performed a physical examination, in which they found that Plaintiff's right arm could carry out 150 degrees of active abduction with pain, as opposed to no pain in his left,

---

[6] Sacroiliac refers to the joint between the sacrum, the bone below the lumbar spine, and the ilium, part of the hipbone. *Dorland's Illustrated Medical Dictionary,* 1341, 1662 (32d ed. 2012).
[7] Spondylolysis refers to dissolution of the vertebra. *Dorland's Illustrated Medical Dictionary,* 1754 (32d ed. 2012).
[8] Lumbarsacral refers to the area on the side of the back at the bottom of the lumbar vertebrae. *Dorland's Illustrated Medical Dictionary,* 1076, 1662 (32d ed. 2012).
[9] Radiculopathy is a disease of the nerve roots. *Dorland's Illustrated Medical Dictionary,* 1571 (32d ed. 2012).
[10] Spine stenosis is a narrowing of a canal caused by encroachment of bone into open spaces. *Dorland's Illustrated Medical Dictionary,* 1769-1770 (32d ed. 2012).

and that Plaintiff showed "significant restriction" in rotating to his right. *Id*. Plaintiff reported difficulty in making any sudden movements. (Tr. 396). Although Plaintiff exercised at home for therapy and took 12 tablets of Advil a week for pain relief, Plaintiff did not feel that he was making any significant improvement. (Tr. 396-97). The doctors concluded that Plaintiff's pain pointed to a positive impingement sign and rotator cuff weakness. (Tr. 397).

   D. **Medical Records After Date of Last Insured**

      1. **Dr. Stephen Huish, D.O.**

Plaintiff visited Dr. Huish, a specialist in sports, spine & orthopedic medicine, after hearing of Dr. Huish's treatment of some of Plaintiff's friends. (Tr. 43). Dr. Huish conducted an initial evaluation of Plaintiff on January 27, 2014 following a physical examination. (Tr. 341-42). Dr. Huish described Plaintiff as "obese with a mildly antalgic gait." (Tr. 341). Dr. Huish noted that Plaintiff could stretch forward 140 degrees with 140 degrees of abduction, but his cross-body abduction was limited to 25 degrees. *Id*. Plaintiff also demonstrated mild weakness in the supraspinatus. *Id*. Plaintiff was diagnosed with, *inter alia*, lumbar disk herniation, lumbar degenerative disk disease, lumbosacral radiculopathy, and right knee osteoarthritis. (Tr. 342). Dr. Huish advised Plaintiff to work on weight loss to ease his lower back pain and knee pain. *Id*.

Plaintiff paid a follow-up visit to Dr. Huish on March 24, 2014. (Tr. 339). Plaintiff reported neck pain, back pain, right shoulder pain, and knee pain. *Id*. Dr. Huish noted restrictions in flexion and abduction of Plaintiff's right shoulder, as well as weakness in Plaintiff's right hamstring. *Id*. Dr. Huish noted past test findings of degenerative changes but expressed concern also about possible intervertebral disk herniation. (Tr. 340).

Plaintiff had another follow-up visit with Dr. Huish on October 27, 2014, at which Dr. Huish repeated his initial diagnoses and noted that Plaintiff had difficulty sitting, standing, carrying, or lifting. (Tr. 337). Dr. Huish's physical examination of Plaintiff revealed similar restrictions and weaknesses identified in Plaintiff's initial visit. Dr. Huish referenced the report from Dr. Nelson and agreed that Plaintiff was "totally disabled." *Id*. Dr. Huish further filled out a functional assessment form, in which he marked that Plaintiff could stand or walk for less than two hours a day, sit for less than four hours a day, and carry between five to ten pounds for about two hours. (Tr. 227). Dr. Huish also noted that Plaintiff required bed rest and frequent breaks throughout the day due to pain and difficulty concentrating on his work. (Tr. 228).

On November 7, 2014, Dr. Huish drafted a medical source report in response to a request from Plaintiff's attorney. (Tr. 331-36). In the report, Dr. Huish concluded that Plaintiff was "totally disabled from any occupation" as a result of his continual pain. (Tr. 335-36). Based on his own evaluation of Plaintiff and a review of Plaintiff's medical records, Dr. Huish determined that Plaintiff had permanent injuries to his spine, right shoulder, right knee, and left hand. (Tr. 335). Dr. Huish highlighted Plaintiff's flexion restrictions, neck and back pain, and weakness of the rotator cuff. (Tr. 332-34).

### 2. Dr. Michael Hearns, M.D.

Plaintiff saw Dr. Hearns, a specialist in occupational medicine, on the recommendation of Plaintiff's sister and attorney. (Tr. 44). Dr. Hearns provided a medical narrative for Plaintiff's attorney on November 21, 2016, noting that Plaintiff's EMG showed bilateral radiculopathy and subsequent MRIs in 2013 and 2014 showed disc herniation. (Tr. 446). Based upon his treatment of Plaintiff from 2014 through 2016 and his review of Plaintiff's record, Dr. Hearns concluded

7

that Plaintiff suffered from cervical and lumbar radiculopathy, rendering him "permanently unfit" to work any job. (Tr. 447).

### 3. Dr. Mario Nelson, M.D.

After Plaintiff's initial visit with Dr. Nelson in 2003, the next record of Dr. Nelson was a visit in December 23, 2013. (Tr. 420). Plaintiff complained of lower back pain which spread to his lower extremities, aggravated by prolonged sitting and standing. *Id*. Dr. Nelson concluded that Plaintiff's disability had worsened over the ten years since his initial visit because in addition to bilateral radiculopathy, Plaintiff's L4 nerve roots were also affected. *Id*. As a result, Dr. Nelson concluded that Plaintiff was "permanently totally disabled." *Id*.

Plaintiff had a follow-up visit with Dr. Nelson on June 24, 2014. (Tr. 416). Plaintiff continued to report complaints about his neck pain and lower back pain. *Id*. Dr. Nelson noted that Plaintiff had become "markedly obese" over the previous ten years, impeding his ability to engage in physical activities. *Id*. Dr. Nelson observed weakness in the shoulder muscles as well as limitation in truck flexion. *Id*. Dr. Nelson repeated his diagnosis of bilateral radiculopathy and added evidence of neuropathy[11] in the wrists. (Tr. 417). Plaintiff was advised to see a chiropractor and given pain medication. *Id*.

On October 21, 2014, Dr. Nelson drafted a medical history summary of Plaintiff's visits. (Tr. 223-26). Dr. Nelson referenced the EMG study in 2003 that showed bilateral radiculopathy and lumbosacral spinal stenosis. (Tr. 224). Dr. Nelson noted that at that time, in addition to Dr. Carr, Plaintiff was also seeing another primary care physician and a chiropractor. *Id*. Plaintiff

---

[11] Neuropathy refers to changes in the peripheral nervous system. *Dorland's Illustrated Medical Dictionary,* 1268 (32d ed. 2012).

8

saw Dr. Nelson in September 2013, where Dr. Nelson diagnosed Plaintiff with marked limitation in his trunk flexion and recommended that Plaintiff undergo an additional MRI and electrodiagnostic study. *Id*. That November 2013 MRI revealed a chronic disk herniation. *Id*. At the conclusion of the report, Dr. Nelson found that Plaintiff's impairments were caused by his work injuries and that he continued to be "permanently totally disabled." (Tr. 226).

### 4. Plaintiff's Testimony

Plaintiff acknowledged that after his second surgery, his second shoulder "kind of stabilized." (Tr. 39). Starting from 2002, Plaintiff began experiencing discomfort instead in his lower back and neck. (Tr. 40). Although Plaintiff found home exercises to be unhelpful, he began regularly swimming, which provided pain relief. (Tr. 36). Plaintiff noted that some days, his pain would be debilitating while other days, he was able to work through the pain. (Tr. 46). Plaintiff admitted that he stopped seeking medical treatment from 2005 through 2013 after learning to just bear through the pain. (Tr. 42).

Plaintiff found that he started experiencing significant weight gain after he retired from the police force. (Tr. 49-50). At the time of his retirement, Plaintiff was about 210 pounds, but after retirement, his weight rose to almost 245 pounds. (Tr. 50). Plaintiff was advised that he was pre-diabetic and guessed that he would probably be considered "morbidly obese." *Id*.

## III. <u>Analysis</u>

### A. <u>Applicable Legal Principles</u>

#### 1. **Standard of Review**

A motion for judgment on the pleadings should be granted if the pleadings make it clear that the moving party is entitled to judgment as a matter of law. However, the Court's review of

the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. Substantial evidence is more than a mere scintilla but requires the existence of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if there exists contrary evidence. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may not determine *de novo* whether Plaintiff is disabled but must accept the ALJ's findings unless "a reasonable factfinder would *have to conclude otherwise*." *Id*.

## 2. Determination of Disability

To be awarded disability benefits, the Social Security Act requires that one have the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ makes this determination through a five-step evaluation process, for which the burden rests on the Plaintiff for the first four steps and only after all four steps are satisfied does the burden then shift to the Commissioner for the final step. 20 C.F.R. § 404.1527.[12]

First, the ALJ must determine that Plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that Plaintiff's impairment is so severe that it limits his ability to perform basic work activities. Third, the ALJ must evaluate whether Plaintiff's impairment

---
[12] 20 C.F.R. § 404.1527 applies here, rather than 20 C.F.R. § 404.1520c, because Plaintiff filed his claim before March 27, 2017.

falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 ("Listings") such that he may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's residual functional capacity ("RFC"), or his ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if Plaintiff's RFC precludes him from meeting the physical and mental demands of his prior employment. If Plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on Plaintiff's RFC, age, education, and past work experience, Plaintiff is capable of performing some other work that exists in the national economy.

**B. ALJ's Decision**

ALJ Stacchini issued an unfavorable decision to Plaintiff after applying the five-step process. (Tr. 10-21). After finding that Plaintiff did not engage in substantial gainful activity throughout the relevant period, ALJ Stacchini noted the following severe impairments: degenerative disc disease of the cervical spine; lumbar radiculopathy; right shoulder impingement, arthritis, and bicep tendon tear; and obesity. (Tr. 12-13). In contrast, ALJ Stacchini determined that Plaintiff's left hand derangement did not rise to the requisite level of severity. (Tr. 13). ALJ Stacchini also noted other impairments that were only "established after the claimant'[s] date last insured" and hence outside the scope of his decision. *Id*. At step three, ALJ Stacchini found that Plaintiff's severe impairments did not meet the criteria of any of the Listings such that he would be considered presumptively disabled. (Tr. 13-14).

ALJ Stacchini then found that Plaintiff had the RFC to perform light work, limited to only occasionally climbing stairs, not climbing ropes or ladders, only occasionally crouching or crawling, and not being required to physically restrain individuals. (Tr. 14). ALJ Stacchini

supported this determination by citing to Plaintiff's testimony as well as the medical record. (Tr. 14-19). Based on this RFC, ALJ Stacchini concluded that Plaintiff was unable to return to his past work as a police officer, but relying on the vocational expert's testimony, found that Plaintiff could perform other work in the national economy such as a cashier, fast food worker, and cleaner. (Tr. 19-20). As a result, Plaintiff was deemed "not disabled" for purposes of DIB. (Tr. 21).

### C. Analysis of ALJ's Decision

Plaintiff's motion raises three issues with ALJ Stacchini's decision: (1) ALJ Stacchini's determination that Plaintiff sufficiently recovered from his shoulder surgery was not supported by substantial evidence, (2) ALJ Stacchini improperly gave little weight to treating physician Dr. Nelson's opinion, and (3) ALJ Stacchini committed legal error by relying on the vocational expert's testimony without resolving the conflict between the testimony and the Dictionary of Occupational Titles' ("DOT") job descriptions. (ECF 20 at 19). Each of those arguments, disputed by the Commissioner, is analyzed below.

#### 1. Substantial Evidence

Plaintiff argues that ALJ Stacchini improperly discounted the effect of Plaintiff's shoulder surgeries when determining Plaintiff's RFC. *Id*. at 20-22. ALJ Stacchini found that Plaintiff's right shoulder impingement resulted in a restriction of light work but that the record seemed to reflect that Plaintiff successfully recovered from his shoulder surgery. (Tr. 15). ALJ Stacchini cited to Dr. Turtel's notes showing that although Plaintiff had right shoulder weakness, Plaintiff regained range of motion in his right shoulder and demonstrated 150 degrees of active abduction and forward flexion of his right arm. (Tr. 16). ALJ Stacchini pointed to Plaintiff's admission that he drove and took care of his children as evidence that Plaintiff's right shoulder

did not impose any significant restriction in his functioning. *Id*. Additionally, ALJ Stacchini highlighted that Plaintiff only had minimal treatment for his right shoulder through 2007, the date of last insured. *Id*.

Plaintiff argues that in making these findings, ALJ Stacchini ignored the opinion of Dr. Turtel and the police pension fund examiners that Plaintiff's right shoulder was disabled and suffered from significant restrictions in movement. (ECF 20 at 20-21). Plaintiff's argument ignores the context of both reports. Although Dr. Turtel acknowledged Plaintiff's significant pain, Dr. Turtel expressly couched his conclusions of disability as to Plaintiff's ability to unholster his gun and perform as a police officer. (Tr. 384-85). Likewise, the police pension fund examiners only evaluated Plaintiff as to his ability to perform the "full duties of a New York City police officer." (Tr. 397). Plaintiff reported pain upon 150 degrees of active abduction of his right arm, but it is unclear from the treatment notes whether that pain would prevent Plaintiff from using his right shoulder for *any* type of work. *Id*. Notably, Dr. Carr referred Plaintiff to Dr. Nelson in 2003 only to address pain in the back and the lower extremities and did not reference Plaintiff's shoulder. (Tr. 235-36).

The medical record's limited findings that Plaintiff's right shoulder was only somewhat restricted is corroborated by Plaintiff's own testimony that he could use his right shoulder for non-police activities. Plaintiff acknowledged that his arm had difficulty with motions for an "extended period of time" but that generally, his shoulder had "stabilized" post-surgery. (Tr. 39). As a result, Plaintiff stated that he focused his treatment on his lower back and neck instead. (Tr. 40). Similarly, Plaintiff reported to the police pension fund examiners that he had difficulty with "quick motion or movement," but did not preclude any movement of the arm.

13

(Tr. 396). Although it could be arguable whether Plaintiff's right shoulder restrictions should result in occasional reaching, as opposed to frequent reaching, giving deference to the ALJ's findings, a reasonable person could conclude that Plaintiff could perform work with frequent reaching. Accordingly, I find that there was substantial evidence to support the ALJ's determination that Plaintiff's right shoulder surgery did not prevent him from performing light work.

### 2. Treating Physician Rule

Plaintiff argues that ALJ Stacchini violated the "treating physician regulations [sic]" by not affording weight to Dr. Nelson's October 2014 medical report on Plaintiff. (ECF 20 at 27). Under the "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical support for the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's level of specialization in the area; and (6) other factors that tend to support or contradict the

opinion. 20 C.F.R. § 404.1527 (c) (2)-(6); *Schisler*, 3 F.3d at 567; *Mitchell v. Astrue*, No. 07-CV-285 (JSR), 2009 WL 3096717, at *16 (S.D.N.Y. Sept. 28, 2009).

In his 2014 report, Dr. Nelson concluded that Plaintiff was "markedly disabled" at the time of Plaintiff's initial visit with him in 2003, referencing findings in 2003 of lumbosacral spinal stenosis and significant paravertebral muscle spasms. (Tr. 223-24). Dr. Nelson cited Plaintiff's lower back pain and limited trunk motion as additional evidence that Plaintiff was unable to work. (Tr. 223). In the report, Dr. Nelson suggested that Plaintiff could only stand less than two hours in an eight-hour work day, sit less than two hours in an eight-hour work day, and would require frequent rests and breaks throughout the day due to his pain. (Tr. 221-22).

Although ALJ Stacchini properly gave little weight to Dr. Nelson's conclusion that Plaintiff was permanently disabled, ALJ Stacchini did not provide sufficient reasons for not giving the remainder of Dr. Nelson's report controlling weight. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (noting that a treating physician's data is given controlling weight but the ultimate disability determination is reserved for the Commissioner). ALJ Stacchini explained his decision by noting that Dr. Nelson only treated Plaintiff twice over the ten-year period before filling out the assessment form,[13] and that Plaintiff paid Dr. Nelson for the report. (Tr. 16).

---

[13] Both parties failed to brief whether Dr. Nelson should be classified as a treating physician. Because Plaintiff only saw Dr. Nelson once during the relevant period, ALJ Stacchini appears to be comparing Dr. Nelson to a consultative examiner. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) (finding that seeing a physician only "once or twice" did not create the requisite physician/patient relationship); *Garcia v. Barnhart*, No. 01-CV-8300 (GEL), 2003 WL 68040, at *5 n. 4 (S.D.N.Y. Jan. 7, 2003) (refusing to classify a doctor seen once as a treating physician because there is no "ongoing relationship"). The Second Circuit has clarified, however, that a treating physician may provide a retrospective opinion on a time period for which he/she was not the treating physician. *See Monette v. Astrue*, 269 Fed. Appx. 109, 113 (2d Cir. 2008). Even though Dr. Nelson only saw Plaintiff once during the relevant period, Dr. Nelson became Plaintiff's treating physician starting in 2013, as evidenced by Plaintiff's multiple visits to Dr. Nelson from 2013 through 2014. (Tr. 224-26). Therefore, Dr. Nelson's opinion can only be discarded in the face of "overwhelmingly compelling" contrary evidence in the record. *See Garcia*, 2003 WL 68040, at *8.

Payment for the report is not a sufficient reason to disqualify a medical opinion; otherwise, almost every physician's opinion would be rejected. *See Garmendiz v. Berryhill*, No. 17-CV-662 (JGK), 2018 WL 3222747, at *10 (S.D.N.Y. July 2, 2018) (rejecting idea that paying for a physician's report should render the opinion suspect).

ALJ Stacchini then found that Dr. Nelson's opinion was inconsistent with Plaintiff's test results, which "only revealed degenerative changes." (Tr. 17). ALJ Stacchini fails to explain, however, why the degenerative nature of Plaintiff's impairments, *i.e.*, degenerative disc disease, has any impact on whether Plaintiff's RFC is restricted by these degenerative impairments. *See, e.g.*, 20 C.F.R. Pt. 404, Subpart P, Appendix 1, Listing 1.00 ("Impairments may result from infectious, inflammatory, or degenerative processes").

ALJ Stacchini also found that Plaintiff's lack of treatment from 2005 to 2013 and participation in daily activities with his family suggested that Plaintiff was not significantly hindered by his injuries. *Id*. This improperly substituted ALJ Stacchini's own evaluation of Plaintiff's daily functioning for that of a medical professional. *See Hooper v. Colvin*, 199 F. Supp. 3d 796, 816 (S.D.N.Y. 2016) (rejecting ALJ's evaluation of treatment notes without corroborating medical opinion). Nor is omission of treatment proof that Plaintiff was not disabled. *See Shaw*, 221 F.3d at 133 (noting that disabled patients sometimes abandon treatment if ineffective). ALJ Stacchini focused on the period in which Plaintiff stopped treatment without considering the context for the cessation of treatment. Plaintiff testified that although his back and neck pain became "progressively worse," he eventually stopped taking pain medication because it made him feel "hung over" and adversely affected his home life. (Tr. 40, 42). Accordingly, ALJ Stacchini committed legal error in giving little weight to

16

treating physician Dr. Nelson's 2014 medical report, and I recommend that the case be remanded for proper evaluation of Dr. Nelson's report.

### 3. Vocational Expert Discrepancy

Plaintiff next argues that ALJ Stacchini erred in considering the vocational expert's testimony without hearing from the vocational expert on the discrepancy between her testimony and the job descriptions in the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("Selected Characteristics"). (ECF 20 at 34). Social Security Ruling ("SSR") 00-4p states, in part,"

> When vocational evidence provided by a [vocational expert] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the [vocational expert's] evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

<u>Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions</u>, SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000). At the hearing, the vocational expert testified that the DOT was silent on the ability to restrain third parties, but that the remainder of her testimony was consistent with the DOT. (Tr. 63). As a result, ALJ Stacchini only asked the vocational expert about the basis for her testimony regarding ability to restrain third parties, to which the vocational expert affirmed that it was based on her training and experience. *Id*. The vocational expert also clarified that the position of document preparer as listed in the DOT was slightly outdated, but that she accounted for that difference. *Id*.

Plaintiff argues that the vocational expert should have raised the additional discrepancy between her testimony that Plaintiff was capable of working as a fast food worker and the Selected Characteristics' listing of a fast food worker as requiring "constant" reaching, a level more restrictive than Plaintiff's RFC of "frequent" reaching. (ECF 20 at 34). The Commissioner does not dispute that there is a discrepancy, but responds that even excluding fast food workers, there were a sufficient number of the other jobs recommended by the vocational expert for Plaintiff. (ECF 20 at 35-36). Determining whether there are a sufficient number of jobs in the national economy available to Plaintiff is a task in the first instance for the ALJ, not the Court. *See Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 454 (S.D.N.Y. 2004). Because ALJ Stacchini was not made aware of the conflict between the Selected Characteristics' description of fast food work and the vocational expert's testimony, ALJ Stacchini could not have resolved the conflict.[14] This is supported by the fact that ALJ Stacchini never questioned the vocational expert about why she believed that Plaintiff could work as a fast food worker despite the need for constant reaching. Accordingly, this case should be remanded for an inquiry into the nature of the discrepancy and how it affects the consideration of the number of jobs in the national economy available to Plaintiff.

---

[14] ALJ Stacchini's decision suggests that he may have recognized that the ability for frequent reaching was inconsistent with the DOT. (Tr. 20 (noting that overhead reaching "is not specifically discussed in the DOT")). Nowhere in the transcript, however, does it reflect that ALJ Stacchini asked the vocational expert about the basis for her opinion on overhead reaching. At the hearing, ALJ Stacchini only asked the vocational expert about restraining third parties and the basis for her testimony regarding that limitation, in light of its absence in the DOT. (Tr. 63).

## IV. Conclusion

For the foregoing reasons, I recommend that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED** and that the Commissioner's Motion for Judgment on the Pleadings be **DENIED**, and that the case be remanded to the Commissioner for further proceedings consistent with this report.

## V. Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be filed with the Clerk of Court and addressed to the Honorable Vernon S. Broderick, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Broderick.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Respectfully submitted,

*s/ Ona T. Wang*
**Ona T. Wang**
United States Magistrate Judge

Dated: August 13, 2019
New York, New York